IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                  Case No. 21-10021-JWB

JUAN O. WHITAKER, SR.,

        Defendant.

**MEMORANDUM AND ORDER**

This case comes before the court on Defendant's motion to suppress. (Doc. 16.) The motion has been fully briefed and the court held an evidentiary hearing on September 23, 2021. (Docs. 17, 20, 22, 23.) Defendant's motion to suppress is DENIED for the reasons herein.

**I.    Facts**

The court finds the following facts from the evidence presented at the hearing. On December 15, 2020, at approximately 2:40 a.m. in the morning, Salina Police Officer Michael Baker was on patrol and driving on N. 9th Street in Salina, Kansas. Officer Baker has been a police officer for eight years and is a certified canine officer. At the time of the stop, Officer Baker had his canine, Karma, with him in his patrol vehicle. When he was driving northbound on N. 9th, he was approaching the I-70 overpass.[1] There are four lanes of traffic on N. 9th, two lanes for each direction, and, in the northbound lanes there is a stoplight at the onramp to the highway. There is also a stoplight on N. 9th after a vehicle drives under the overpass. That stoplight is immediately

---

[1] The traffic stop was recorded by a video system in the patrol car. It was admitted into evidence in the hearing as Government Exhibit 3.

past the westbound exit ramp from I-70. This exit ramp also faces a stop light for vehicles coming off I-70.

Upon approaching the stoplight on the south side of the overpass, Officer Baker observed a vehicle on the westbound I-70 exit ramp. At that time, Baker was approximately 700 feet from the exit ramp and approaching at approximately 25-30 miles per hour. Officer Baker testified that he observed the vehicle fail to stop behind the white line at the stop light, which was red for vehicles approaching the intersection from the westbound exit ramp. The vehicle remained stopped for several seconds. The vehicle then inched forward and slowly made a right turn onto N. 9th Street. Officer Baker was then directly behind the vehicle and further observed the vehicle travel left of the dashed line separating the two northbound lanes on N. 9th Street. The vehicle then corrected by slowly moving back into the right lane. At this point, Officer Baker suspected that the driver might be impaired because he observed the driver fail to stop prior to the stop line, linger at the intersection for several seconds before turning right onto N. 9th Street even though there was no traffic to which the driver was required to yield, and then fail to stay in his lane of traffic. The vehicle then took a right turn onto Diamond Drive. After turning right on Diamond, the vehicle proceeded to drive down the center of the street although there are no lines indicating the lanes of traffic for this road. At this point, Officer Baker decided to stop the vehicle because of the violations and his belief that the driver might be impaired.

Officer Baker testified that he suspected the driver might be impaired because it was late at night and soon after most bars closed for the evening, the driver failed to stop before the stop line on the exit ramp, lingered unnecessarily before executing a right turn onto N. 9th Street, failed to maintain his lane on N. 9th, and drove down the center of Diamond. He further testified that these violations were common with impaired drivers. Upon stopping the vehicle, Officer Baker

approached the vehicle on the passenger side. The stop was recorded on Officer Baker's body camera. Officer Baker told Defendant, who was the driver and sole occupant, that he stopped him because he was driving "in the middle lanes" when he came off the exit ramp and turned onto N. 9th. He then asked Defendant if he was drunk and also asked if he had been drinking and driving. Defendant responded that he was not and had not. Officer Baker then asked for his driver's license and insurance. Defendant could not locate his insurance and Baker told him to keep looking while he went back to his patrol car.

Officer Baker further testified that his interaction with Defendant dispelled any belief that Defendant was impaired. Baker testified that the following led him to believe Defendant was not impaired: Defendant's speech was not slurred; there was no smell of alcohol; and his eyes were not blurry. Baker planned to write a warning ticket for a failure to maintain a lane. Ultimately, Defendant could not find the proof of insurance for the vehicle. Officer Cook, another officer with the Salina Police Department, arrived at the scene and Baker told him to write a ticket for no proof of insurance. As Officer Cook wrote the ticket, Baker ran Karma around the vehicle to perform a free air sniff. (Doc. 17-5 at 2.) Karma alerted and the vehicle was searched. The search revealed a glass pipe with suspected methamphetamine residue in the cup holder and small pieces of marijuana on the floor. (*Id.*) Defendant was placed under arrest and his person was searched. This led to the discovery of a baggie containing methamphetamine in his pocket. (*Id.*)

Defendant was charged by indictment with one count of possession with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a). (Doc. 1.) Defendant filed a motion to suppress the methamphetamine seized in the search on the basis that the stop was unreasonable in violation of the Fourth Amendment. Defendant further argued that the duration of the stop was unreasonable and challenged Karma's qualifications. At the hearing and in his reply brief,

Defendant notified the court that he was withdrawing his challenges to the duration of the stop and Karma's qualifications.[2] (Doc. 23 at 1.) Therefore, the only remaining issue is whether the initial stop was reasonable under the Fourth Amendment.

**II.      Analysis**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has liberally interpreted "seizures" to encompass routine traffic stops, "even though the purpose of the stop is limited and the resulting detention quite brief." *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). An initial traffic stop is justified at its inception if "an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). "Reasonable suspicion requires that an officer provide 'some minimal level of objective justification.'" *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (citing *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984)). This requires only "a showing considerably less than preponderance of the evidence." *Id.* at 1263 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The court's standard for evaluating a traffic stop is objective, rather than subjective. *United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009). Once an officer observes a traffic violation, "a *Terry* stop is objectively justified, regardless of the detaining officer's subjective motives." *Id.* (quotation omitted).

In this case, the government argues that Officer Baker had reasonable suspicion to stop Defendant for failing to maintain a single lane, K.S.A. 8-1522, driving under the influence, K.S.A.

---

[2] The government had also initially challenged Defendant's standing. (Doc. 20.) The government notified the court at the hearing that it concedes that Defendant has standing to challenge the stop and search of the vehicle.

8-1567, and failing to stop behind a stop line at a red light, K.S.A. 8-1508(c)[3]. (Doc. 20 at 7.) Turning first to the statute requiring drivers to maintain a single lane, Officer Baker testified that he observed Defendant cross the dash line on a single occasion after he had made a right turn onto N. 9th Street. Officer Baker further testified that there was not any wind that evening that would cause a driver to have difficulty maintaining his lane. Defendant argues in his motion that the video does not support Baker's assertion that his vehicle crossed the dashed line. During the hearing, however, the video was shown and Baker identified where the vehicle was traveling on what appears to be the dashed line. Contrary to Defendant's assertions, the video does not contradict the testimony of Baker. The video does appear to corroborate the testimony that Defendant either crossed the dash line or was driving on that line. The court finds that based on this evidence a reasonable officer could conclude that Defendant did not maintain his lane of travel on one occasion when he was driving onto N. 9th. Therefore, the court must determine whether this one instance of failing to maintain a lane is sufficient to establish reasonable suspicion that the statute was violated.

The statute states that "a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." K.S.A. 8-1522(a). That statue has been heavily litigated in Kansas. Although the parties spend significant time discussing *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996), and the implications of that case with respect to the facts of this case, more recent authority is more probative here.

---

[3] The government initially cited to K.S.A. 8-1528(b) in support of this violation. That statute governs conduct at a stop sign. At the hearing, the government identified K.S.A. 8-1508(c) as the statute that governs conduct at a stop light and the basis for the stop in this case.

In *State v. Marx*, 289 Kan. 657, 215 P.3d 601 (2009), the Kansas Supreme Court discussed K.S.A. 8-1522(a). In doing so, the court held that K.S.A. 8-1522(a) "is not a strict liability offense" and that it "requires more than an incidental and minimal lane breach." *Marx*, 289 Kan. at 674. Notably, it does not transform "any and all intrusions upon the marker lines" into a violation. *Id.* To demonstrate reasonable suspicion of a § 8-1522(a) violation, the court held that "a detaining officer must articulate something more than an observation of one instance of a momentary lane breach." *Marx,* 289 Kan. at 675. *Marx* requires "two things to show that an officer had the requisite reasonable suspicion: 1) evidence that the driver departed his lane at least twice, and 2) evidence of the driving conditions from which a court could infer that it would have been practical for the driver to stay in his lane." *United States v. Ockert*, 829 F. App'x 338, 341 (10th Cir. 2020), *cert. denied*, 209 L. Ed. 2d 560 (Apr. 19, 2021) (citing *Marx*, 289 Kan. at 675). In this case, the evidence only shows one minimal lane breach. Therefore, this is not sufficient to establish the requisite reasonable suspicion. *Id.*

Next, Officer Baker testified that he also stopped Defendant because he suspected that he might be impaired in violation of K.S.A. 8-1567, which prohibits operating a vehicle while under the influence of alcohol and/or any drug. Viewing all of the evidence, the court finds that an officer would have reasonable suspicion to stop Defendant for impaired driving. First, the evidence shows that Defendant did not maintain a single lane after turning onto N. 9th. Although this was not sufficient to establish reasonable suspicion of a § 8-1522(a) violation, it can be considered in connection with other driving activity to establish suspicion that Defendant was impaired. *See United States v. Triska*, 574 F. Supp. 2d 1208, 1213–14 (D. Kan. 2008). Officer Baker also testified that he observed Defendant fail to stop behind the white line when he was exiting the highway and the light was red. According to Baker, Defendant's vehicle stopped over the white

line. The applicable statute states that a vehicle facing a steady red signal "shall stop at a clearly marked stop line." K.S.A. 8-1508(c). Defendant argues that he did stop prior to the stop line, that Baker could not have seen where the stop line was, and that the video supports his position. Defendant further argues that the court should disregard this alleged violation as it was not mentioned in the police report or during the stop. While the records and video do not reference a failure to stop behind the stop line, the court declines to discredit Baker's testimony on this basis in light of his testimony during the hearing, which the court finds credible, and the video evidence.

During the hearing, Baker testified that he could observe Defendant fail to stop prior to the stop line. While it is not entirely clear when reviewing the video whether Defendant stopped past the white line, the court finds that the video does corroborate Baker's testimony as it appears that Defendant's vehicle is stopped past the stop line based on the relative position of the stop lights and Defendant's vehicle. In the video, it appears that the vertical pole on which the stop light is mounted is behind Defendant's taillights which supports a finding that he was stopped beyond the white line based on photographs of the intersection and light signals at that intersection that were introduced into evidence. Therefore, this observation by Baker lends support to his suspicion that Defendant was impaired.

Baker also testified that he suspected Defendant was impaired because he was driving down the center of Diamond Drive. While Diamond Drive does not have lines, it is a two-way street and it is clear on the video that Defendant is driving in the center of that street. Moreover, Baker further testified that these observed traffic infractions are typical of a driver who is impaired and it was late at night. Viewing all of these factors combined, the court finds that Officer Baker had an articulable, reasonable factual basis to suspect that Defendant was impaired when he stopped Defendant. *See Triska*, 574 F. Supp. 2d at 1213–14 (finding that the officer had reasonable

suspicion to believe the defendant was impaired or tired when he drifted across the fog line, it was early in the morning, and he had out of town plates); *see also United States v. Lee*, 73 F.3d 1034, 1038 (10th Cir. 1996), *overruled on other grounds*, (straddling center line supported reasonable suspicion that driver was sleepy or intoxicated); *United States v. Jones*, 501 F.Supp.2d 1284, 1299 (D. Kan. 2007) (officer had reasonable suspicion that driver was sleepy because no adverse conditions explained sudden swerve onto shoulder, vehicle had Minnesota license plate, time was early morning and vehicle had been recently driven in weather different from weather in area); *United States v. Villanueva*, 157 F. Supp. 2d 1184, 1189 (D. Kan. 2001) (officer had reasonable suspicion that driver was sleepy or impaired where driver crossed lane marker three times within short distance in early morning).

Although the government argues that the evidence supports a finding that an officer would have reasonable suspicion to stop Defendant for a violation of K.S.A. 8-1508(c), the court need not address the arguments raised regarding this reason for the stop as it has determined that the stop was lawful under § 8-1567. *See United States v. Winder*, 557 F.3d 1129, 1135, n. 1 (10th Cir. 2009) (upon a finding that an officer obtained reasonable suspicion that a defendant violated a traffic law, the court need not consider whether there was reasonable suspicion under another traffic law); *United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001); *United States v. Acevedo*, No. 16-40109-DDC, 2017 WL 3437690, at *6 (D. Kan. Aug. 10, 2017).

### III.   Conclusion

Defendant's motion to suppress (Doc. 16) is DENIED.

IT IS SO ORDERED.  Dated this 29th day of September, 2021.

__s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE
